UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ANTHONY D. GULLUNI, | ) | |
| District Attorney for the Hampden | ) | |
| County in the Commonwealth of | ) | |
| Massachusetts, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:21-cv-30058-NMG |
| | ) | |
| NATHANIEL R. MENDELL, | ) | |
| Acting United States Attorney for | ) | |
| the District of Massachusetts, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>AFFIDAVIT OF JENNIFER N. FITZGERALD, ESQ.</u>**

I, Jennifer N. Fitzgerald, Esq., do state on oath as follows:

1.     I am the First Assistant District Attorney for the Hampden County District Attorney's Office (the "HCDAO") and the plaintiff, District Attorney Anthony Gulluni (the "HCDA").

2.     The plaintiff, Anthony Gulluni, is the duly elected and sworn District Attorney for Hampden County in the Commonwealth of Massachusetts

3.     The Solicitor for the City of Springfield, Edward M. Pikula, informed me that the Department of Justice ("DOJ") was given direct access to the Springfield Police department ("SPD") computer system so that it could conduct the document review underlying its report of July 8, 2020, without participation or assistance from the SPD, and without needing to inform the SPD which documents it reviewed.  He subsequently confirmed that statement in writing.  *See* Attachment 1, which is a true and accurate copy of a letter I received from Solicitor Pikula dated July 2, 2021, at 2.

4.      Solicitor Pikula, orally and in writing, confirmed that he had requested that the Springfield Police Commissioner direct SPD personnel to review the DOJ report of July 8, 2020, and attempt to identify the incidents described in the report.  She assigned Deputy Chief Steven Kent of the SPD.  *See* Attachment 2, which is a true and accurate copy of a letter I received from Solicitor Pikula dated August 24, 2021, at 2.

5.      According to Solicitor Pikula, Deputy Chief Kent conducted a search and believes that he has likely identified to a reasonable degree of certainty some of the incidents described in the DOJ report – estimated at roughly 16 of the 20 to 23 incidents for which the report provided some detail.  Approximately 30 officers involved in those incidents have also been identified by my office.  *See* Attachment 1 at 2.

6.      There remain other examples cited in the DOJ report which could not be identified with certainty by Deputy Chief Kent.  *See* Attachment 1 at 2.  I estimate that number to be at least four (4) incidents.

7.      In addition to these still-unidentified incidents specifically described in the DOJ report, the DOJ made numerous more general criticisms and allegations of misconduct by the SPD that it did not support with any identifying details.  *See* Attachment 1 at 2.  *See also*, for example, the DOJ report states at page 16 ("officers made false reports that were inconsistent with other available evidence"; "Narcotics Bureau officers regularly underreport uses of force"); at page 17 ("many [Narcotics Bureau arrest reports] refer to a use of force that is not documented anywhere else"); at page 18 ("multiple incidents in which available evidence discredited the Narcotics Bureau officers' account of what occurred"), at pages 18-19 ("not uncommon for Narcotics Bureau officers to write false or incomplete narratives that justify their uses of

force"), at page 21 ("on multiple occasions, outside evidence, including video footage, demonstrated that Narcotics Bureau officers' descriptions of events involving use of force situations was not credible.")

8.      Based on Deputy Chief Kent's identification of certain incidents and officers, the plaintiff has begun the process of disclosing the SPD reports associated with those incidents to defense counsel in the identified cases as well as in all other cases where those officers are mentioned in the reports.

9.      There are approximately 8,419 Hampden County criminal defendants to whom disclosure has been or will be made of the exculpatory materials identified through this process.

10.     The process of making disclosures to counsel for these defendants began in September 2021 and is expected to continue through approximately the March/April 2022 time frame.

11.     Two individual defendants, two defense attorneys, the Committee for Public Counsel Services, and the Hampden County Lawyers for Justice, represented by the American Civil Liberties Union, have filed an original petition in the Supreme Judicial Court against the Hampden County District Attorney, accusing the HCDAO of systematically withholding exculpatory evidence about misconduct by the SPD, and seeking an order that HCDAO conduct an investigation into the misconduct as reported by the DOJ, as well as various other procedural and substantive remedies for alleged *Brady* violations. *See Committee for Public Counsel Services & others v. District Attorney for Hampden County*, (Massachusetts) Supreme Judicial Court for Suffolk County, No. SJ-2021-0129.

12.     I have been informed by Solicitor Pikula that the DOJ and the Springfield Police Department have been engaged in discussions with the Department of Justice and the United States Attorney's Office for the District of Massachusetts regarding a consent decree to resolve the issues raised by DOJ's July 8, 2020, report and that the discussions are nearly complete.  *See also* Attachment 2 at 2.


Signed under the penalties of perjury this 31st day of January 2022.


Jennifer N. Fitzgerald, Esq.

# Attachment 1

**Edward M. Pikula**
*City Solicitor*
Law Department
36 Court Street, Room 210
Springfield, MA 01103
Office: (413) 787-6085
Direct Dial: (413) 787-6098
Fax: (413) 787-6173
Email: epikula@springfieldcityhall.com




### THE CITY OF SPRINGFIELD, MASSACHUSETTS

July 2, 2021

Jennifer N. Fitzgerald
First Assistant
Hampden District Attorney's Office
50 State Street
Springfield, MA 01103

This correspondence is in follow up to a request from the District Attorney to Commissioner Clapprood for records, dated December 2, 2020, my response (on behalf of Commissioner Clapprood) to the District Attorney dated  December 10,2020, a follow up letter from the District Attorney dated March 11, 2021,  as well as email communications between us March 16, 2021 and April 26, 2021.
The District Attorney's letter to the Commissioner, referring to the DOJ Report and the voluminous records reviewed, states:

> investigators reviewed 5,500 arrest reports and 10 use-of-force reports from the Springfield Police Department's Narcotics Bureau from 2013-2018. Found by investigators, Report at 2, were "examples where Narcotics Bureau officers falsified reports to disguise or hide their use of force[;]" and Report at 16, "... a pattern or practice ... [where] officers made false reports that were inconsistent with other available evidence, including video and photographs... "

A footnote in the letter from the DA states:

> the reported findings of unconstitutional law enforcement conduct, as described in the twenty-eight-page Report, suggest the documents supporting these findings may contain potentially exculpatory material as that term is legally understood, and is subject to my mandatory review to effectively meet the constitutional, statutory, and ethical obligations of my office

As stated in my response to the District Attorney:

> The City of Springfield has not been provided any information from the Department of Justice specifying any identifying information as to the case numbers, names of officers, or names of individual criminal defendants described in the Report. Shortly after receipt of the report, the Police Commissioner assigned personnel to review the incidents described in the Report in an effort to identify the specific dates of incidents, police officers, and individuals referenced in the Report. While some appear obvious and involve case information already fully disclosed to your office,

ADA Fitzgerald
July 2, 2021
Page 2

such as references to an incident relating to juveniles arrested in Palmer or an
incident occurring near the Nathan Bills Restaurant; and others have been identified
with a reasonable degree of certainty, some of the examples could not be identified
with certainty and the effort to do so is ongoing.

Moreover, the review revealed a number of statements contained in the report which
the Police Commissioner believes are not accurate. However, while the Police
Commissioner disagrees or disputes statements contained in the report, she has
repeatedly stated that she acknowledges the need for reforms in the Department and,
with the full support of Mayor Sarno, she has initiated efforts to make changes based
on the recommendations set forth in the report and is committed to implement
reforms within the entire Springfield Police Department. I am informed that, since
receipt of the Report and the implementation of changes so far, the Police
Department has not received any citizen complaints alleging excessive force by the
Narcotics Unit.

The DOJ report makes numerous references to instances with little identifying information other
than to describe the multiyear time period and type of report (injury, arrest, IIU, etc.) and a
description of statistics to summarize the review. The report states that 114,000 pages of SPD's
incident reports, investigative reports, policies, training materials, and other internal documents were
reviewed. As noted in previous correspondence, any and all records which can be made available
to you that can be identified as reviewed by DOJ will be provided to you at your request.
However, as I indicated to you in our conversation, to work efficiently with the DOJ they were
provided access to the department's record management system and I am not sure whether or not our
IT professionals are able to accurately track what information they accessed. In addition, a report
was prepared by Deputy Chief Kent but I believe it is confidential as protected by the work-product
doctrine as an internal memorandum prepared for the purpose of discussing potential litigation
strategy. The documents provided with this letter in the appendix were utilized in preparing that work
product.

However, in order to provide an exhaustive and accurate accounting of all records requested by
your office will require a cooperative effort between DOJ, the Police Department, and the
District Attorney's Office. As previously indicated, this office stands ready to assist you in
identifying any *Brady* material.

As a first step towards accomplishing this, in follow up to my letter and our subsequent
communications, set forth below is a summary of each incident as described in the DOJ report,
identified in the order each is discussed in the report that could be reasonably identified.
Submitted with this letter is an appendix containing documents relative to each of the incidents
which the police department has been able to reasonably gather in its efforts to identify each
incident described in the DOJ report. In most cases this includes the arrest report identifying
number and the date of arrest. In other cases, only an Internal Investigating Unit identifying
number was available. These documents in the appendix contain information that is confidential
and protected under CORI. I would request that no documents be released unless properly
redacted of confidential or privileged data.

The records provided in the appendix are not exhaustive as to each incident but are provided
with the intent to identify the incidents described as best as we are able. These records were

ADA Fitzgerald
July 2, 2021
Page 3

collected as a result of the Police Commissioner assigning personnel to review the incidents described in the Report in an effort to identify the specific dates of incidents, police officers, and individuals referenced in the Report with legal counsel. They are being shared to make you aware of our efforts to identify potential *Brady* material with your office.

The documents should be carefully reviewed as these records reflect the best efforts to identify the incidents summarized in the report, but the records cannot always substantiate the description set forth in the DOJ report. As previously indicated, many items in the DOJ report are disputed as inconsistent with the reports that SPD was able to identify.

Once your office has had a chance to review the records provided and the information in this letter, I would anticipate a need to verify whether the incident in the DOJ report matches the records produced in the appendix and to determine potentially exculpatory material as that term is legally understood and is subject to your mandatory review to effectively meet the constitutional, statutory, and ethical obligations of your office. The incidents as described in the DOJ report, together with a reference to the corresponding documents listed as exhibits in the appendix outlining the facts alleged in the DOJ report for each incident and the page number, are set forth below. A copy of the DOJ Investigation Report is also included in the appendix:

1. "October 2018, the United States indicted a veteran Narcotics Bureau sergeant for color of law violations related to his 2016 arrest of two juveniles. The indictment alleges that the sergeant kicked one of the youths in the head, spat on him, and said, "welcome to the white man's world." Further, the sergeant allegedly threatened to, among other things, crush one of the youth's skulls and "fucking get away with it," "fucking bring the dog back [and] let him fucking go after" a youth, "fucking kill [one of the youth] in the parking lot," charge a youth with a murder and "fucking make it stick," and that he would "stick a fucking kilo of coke in [one of the youth's] pocket and put [him] away for fucking fifteen years." The indictment also alleges that during interrogation, the sergeant "pointed to blood on his boot" and told one of the youths that if he lied, the youth's "blood would be on [the sergeant's] boot next." The case is pending." (DOJ p.2).

   "In addition to the federal criminal charges filed against this officer, one of the youths filed a civil lawsuit alleging that the officer used excessive force against him. The lawsuit alleges officers beat the youth so severely that he received a fractured nose, two black eyes, and numerous head contusions and abrasions. The sergeant who threatened the youths initially received a 60-day suspension for the incident, but SPD suspended him without pay after he was criminally indicted by a federal grand jury in 2018. The civil lawsuit against the City and the criminal charges against the sergeant are both still pending. As a result of this controversy, local prosecutors have had trouble successfully prosecuting drug crimes in Springfield, in large part due to the fact that they have not been able to rely on testimony from discredited Narcotics Bureau officers." (DOJ p.3).

   See Exhibit 1 in Appendix.

ADA Fitzgerald
July 2, 2021
Page 4

2. "In one incident, six off-duty SPD officers not assigned to the Narcotics Bureau fought with four men in a parking lot outside a bar in April 2015. The officers reportedly caused significant injuries to the men, including knocking one unconscious and fracturing his leg and skull, kicking and punching another while he lay on the ground covering his bleeding face, and kicking a third man in the head repeatedly. The Massachusetts Attorney General's Office has criminal charges pending against several then off-duty and then on-duty SPD officers; charges include both assault and battery and that some officers covered up the incident by providing false reporting.

   The alleged beating of civilians outside a bar and alleged willingness of officers to cover up fellow officers' misconduct demonstrate accountability lapses within the Department." (DOJ p. 5).

   See Exhibit 2 in Appendix.

3. "A former Narcotics Bureau evidence officer was indicted in January 2016 for stealing cash from the narcotics evidence room. The stolen cash allegedly was obtained from more than 170 drug cases and totaled almost $400,000. The officer was a 43-year-veteran of SPD, and at the time of his retirement in July 2014, was the longest- serving officer in SPD. The officer died before this matter could be resolved legally or administratively." (DOJ p.6).

   As noted in the DOJ report, "the City and SPD have taken some steps to address matters within the Department in response to this incident" including "a City-led audit of SPD's record-keeping practices" as well as "the hiring of a consultant to review SPD's accountability systems, as well as all SPD policies and protocols. In early 2019, the consultant issued its first report, which addressed accountability, finding that although SPD has some practices in place regarding complaint intake, classification, and investigation, the practices are not comprehensive or codified appropriately in policy. The report recommended that IIU create a detailed internal affairs manual outlining the process for receiving, investigating, and resolving complaints. It also recommended that IIU create an updated electronic case management system to document and track complaints. The report further recommended improvements to the CPHB by expanding the Board from seven members to at least nine, staffing the Board with individuals who have relevant police and trial experience, and appointing an oversight coordinator that would be responsible for the daily administration of the Board. The City and SPD have publicly committed to implementing these reforms. To date, SPD has revised its IIU policies and added a captain to oversee IIU. In addition, the City added an additional CPHB member, bringing the total to eight members, and allocated additional resources to the CPHB." (DOJ p.6).

   See Exhibit 3 in Appendix.

ADA Fitzgerald
July 2, 2021
Page 5

4. "[I]n one incident, Narcotics Bureau officers punched V.A., a 25-year-old man, following a foot pursuit.[20] When the four Narcotics Bureau officers approached V.A. and motioned to him to remove his earphones, officer reports state that V.A. pushed one of the officers and began running away. After they caught up to V.A., a Narcotics Bureau supervisor delivered multiple punches to V.A.'s face, allegedly because V.A. looked prepared to fight by holding his closed fist in a "punching position." V.A. sustained a broken nose and lip laceration requiring three stitches. The incident then allegedly continued on the ground with an officer and V.A. exchanging blows, though there is no evidence indicating that the officer sustained any injuries. Instead, it appears that officers chased V.A. and initiated the use of force by striking V.A., a non-assaultive subject, with multiple punches, immediately using a means of force that was disproportionate to the subject's resistance without attempting other less dangerous uses of force. Given that four officers were present, other methods of control could have been used instead of immediately punching him in the head." (DOJ p.12)

   See Exhibit 4 in Appendix.

5. "In another incident, a Narcotics Bureau officer punched T.S., a 17-year-old youth, as he rode a motorbike past a group of Narcotics Bureau officers. At the time of the punch, the officers were making unrelated arrests; when the youth rode his motorbike past the officers, reportedly at a high rate of speed, an officer struck the youth. In the involved officer's arrest report, he does not characterize the strike as a punch, but rather states that he "extended his left arm" to prevent the youth from colliding with him on the motorbike. The 17-year-old then "swerved" his motorbike and the officer ended up "mak[ing] contact" with the youth's head and shoulder area. Administering a fist strike in this circumstance was particularly dangerous as the youth could have easily lost control of the motorbike, severely injuring himself, the officer, or others. The subject's brother, L.S., was also punched in the face, but by a different Narcotics Bureau officer. The officer who punched L.S. reported that he did so because L.S. ran towards the officer "with his fist clenched and arm cocked back." None of the other officers at the scene corroborated the punching officer's account." (DOJ p.12).

   See Exhibit 5 in Appendix.

6. "In a third incident, a Narcotics Bureau officer pushed J.B., a 22-year-old man, in the face following a foot pursuit where J.B. exhibited no assaultive behavior. After four Narcotics Bureau officers observed J.B. to be engaged in a narcotics transaction, an officer engaged in a foot pursuit and shoved J.B. from behind so that he fell to the ground. As reported by the officer in the prisoner injury report narrative, J.B. rolled over and began to push at the officer in an attempt to escape, as opposed to in an assaultive manner. The Narcotics Bureau officer then struck J.B. in the face with a closed fist, resulting in a laceration to his lower lip. Nothing in the officer's narrative indicated that J.B. was engaging in the kind of active physical threat that would condone the use of a knuckle punch to the face. The fact that four Narcotics Bureau officers were involved in this arrest made it even less necessary to

ADA Fitzgerald
July 2, 2021
Page 6

strike the subject in the head to gain compliance." (DOJ p. 13).

See Exhibit 6 in Appendix.

7. "In the course of one drug arrest, for example, a Narcotics Bureau officer punched R.F., a slight, middle-aged man, while attempting to retrieve contraband. Officer reports state that R.F. resisted opening his fist and instead attempted to free his wrist from the Narcotics Bureau officer's grasp; officers then immediately punched him in the face. The Narcotics Bureau officer who punched R.F. escalated the situation without attempting other means of gaining compliance, unnecessarily resulting in a serious use of force. R.F. is not a large individual – 5'9" and 140 pounds – and there was no evidence that he had access to a weapon or otherwise posed a threat. The arrest report also shows that at least four Narcotics Bureau officers were on the scene." (DOJ p.13).

See Exhibit 7 in Appendix.

8. "In one incident, *see infra* Section III.C.3., video footage shows that officers rushed into a store and immediately hit S.L. in the face. The encounter happened so quickly that it appears the plainclothes officers failed to identify themselves. The video lacks audio, but at a minimum, the video makes clear that if officers did announce themselves or issue a command, they failed to provide S.L. with any time to react to the officers and surrender before he was hit." (DOJ p. 14).

See Exhibit 8 in Appendix.

9. "In the case of P.J., he claimed that he fled in his vehicle because he was being chased by an unmarked vehicle and did not know law enforcement officers were in that vehicle. In one report, an officer describes "extracting [P.J.] through the passenger side door and proned [him] face down onto the pavement." Photos show he sustained significant injuries—severe contusions and dark bruising on the right side of his face, a large black eye, a gash on the bridge of his nose, and additional abrasions on the left side of his face and the left side of his nose. These injuries are inconsistent with the officers' reports that P.J. had "small cuts to the face," and are instead consistent with repeated strikes of his head." (DOJ p.14).

"In the case of P.J., described above, a Narcotics Bureau officer stated that he made an effort "to extract[ ] [P.J.] through the passenger side door and prone[] [him] face down onto the pavement." According to another officer's narrative, this resulted in "minor abrasions to the right side of his face," and according to the booking sergeant in charge of filling out the SPD-276 form, P.J. had "small cuts to the face." These descriptions of P.J.'s injuries are plainly contradicted by the photographs in his prisoner injury file. These photographs clearly show severe contusions and dark bruising on the right side of his face, a large black eye, a gash on the bridge of his nose, and additional abrasions on the left side of his face and the left side of his nose. The injuries present in the photographs are inconsistent with the officers' reports, and are instead consistent with repeated strikes to P.J.'s head. Further,

ADA Fitzgerald
July 2, 2021
Page 7

when interviewed by IIU after P.J. filed a complaint, a civilian witness stated that
she saw officers kick P.J. in the head and body. During his IIU interview, P.J.
stated that one officer struck him in the head with the butt of a handgun, and that
once on the ground, several officers began kicking and punching him in the head
and the body. P.J. further alleged that, once back at the station and in a holding
room, a Narcotics Bureau officer walked in and beat him severely in the face with a
book, causing him to bleed profusely. To be clear, there is no other corroboration of
P.J.'s version of events besides the photographs we reviewed and the statement of
the civilian witness. But these pieces of evidence are more consistent with some of
P.J.'s reporting of the takedown than the officers' reports. Although IIU
investigated P.J.'s complaint, IIU failed to sustain P.J's allegations and the officers
received no discipline." (DOJ p. 14).

See Exhibit 9 in Appendix.

10. "In the case of F.D., two Narcotics Bureau officers, including one supervisor, stated
that after a brief pursuit of F.D.'s vehicle, they pulled F.D. from the car onto the
ground. One officer's report says F.D. was "placed" on the ground and another
officer's report states that F.D. was "escorted" to the ground. But photos of the
abrasions to F.D.'s face demonstrate the use of serious force and multiple points of
impact including: the left side of his forehead, the right side of his forehead, and his
cheek. F.D. reported in an interview that he was kicked in the face and upper body
area 10-12 times, with multiple officers taking turns kicking him. Regardless of
whether these injuries were caused by an aggressive takedown or direct kicks to the
head, the prisoner injury report narratives do not indicate that any such force was
necessary. None of the officer reports state that F.D. resisted arrest or was
combative, and this is further supported by the fact that he was not arrested for
resisting arrest or assault and battery of a police officer. According to documents,
12 officers were listed as involved with the arrest and four officers completed
prisoner injury report narratives, all arising from an incident that began when F.D.
failed to stop because he did not know he was being chased by officers." (DOJ p.
14).

See Exhibit 10 in Appendix.

11. "[I]n the course of a recent arrest, roughly a dozen officers, most of them Narcotics
Bureau officers, executed a narcotics warrant for A.E. After a vehicle pursuit, A.E.
eventually stopped but refused to get out of the car, and officers physically pulled
him out. At some point during his extraction from the car, A.E.'s head struck the
pavement directly, and the booking photos show significant swelling in his right
forehead area in two points of impact, indicating that officers likely used additional
force once A.E. was on the ground. The officers' own reports indicate that Narcotics
Bureau officers had A.E. under control at all times, and nothing indicates that his
head needed to be slammed to the pavement. Despite the serious head injuries
depicted in the booking photos, one officer's report described A.E. as having only a
"minor injury" above his eye. Notably, the Narcotics Bureau officers' accounts of

ADA Fitzgerald
July 2, 2021
Page 8

what happened in the course of the arrest are also inconsistent with each other. One Narcotics Bureau officer reported that A.E. and other officers fell to the ground together, and that A.E. then continued to struggle and resist handcuffing. Another officer did not mention that any officers fell to the ground, and instead reported that A.E. tried to pull away when officers handcuffed him and "stumbled falling to the ground." Viewed in isolation, each officer's report fails to describe circumstances that would justify the level of force used in this encounter. Viewed together, the inconsistencies between these reports demonstrate that the officers did not accurately report how A.E. sustained the significant and multiple injuries to his head." (DOJ p. 15).

See Exhibit 11 in Appendix.

12. "[D]uring the execution of an arrest warrant in 2017, a Narcotics Bureau officer used force against a subject who refused to exit his home, but the officer did not report the use of force in a prisoner injury file. Citing an "aggressive barking dog," the officer executing the warrant deployed one burst of oleoresin capsicum (OC) spray to the subject's face through a window, and then pulled the subject through the door. Once the subject was out of the house, the officer used a leg sweep, causing the subject to land on the floor of the porch. The officer then struck the subject with his fist in the upper arm/shoulder area. The force employed during this incident was not reported in a prisoner injury file." (DOJ p. 16).

See Exhibit 12 in Appendix.

13. "According to another Narcotics Bureau arrest report from 2018, while executing an arrest warrant related to the sale of narcotics, officers took a subject from the front seat of a car and placed him face down on the street in order to be handcuffed. The arrest report notes that he "sustained minor abrasions to his forehead." There is no accompanying prisoner injury file for this incident." (DOJ p. 16).

See Exhibit 13 in Appendix.

14. "Officers regularly use rote and pat language to justify their uses of force without providing individualized descriptions. Reports often contain conclusory language calling a particular use of force reasonable without describing in detail the circumstances surrounding the use of force. One report, for example, said that as the officer attempted to stop the subject from fleeing, they "both violently fell to the ground. Once on the ground [the subject] continued to struggle[,] at which point [another officer] arrived and began assisting and controlling and placing [the subject] under arrest." The report concludes by stating, "[o]nly reasonable and necessary force was used to apprehend the subject.". (DOJ p. 17).

Nor=t able to determine incident.

ADA Fitzgerald
July 2, 2021
Page 9

15. "Other reports acknowledge some sort of a struggle, but fail to document the specific resistance encountered or the specific type of force used by the officers involved. One such prisoner injury narrative simply stated about a female subject that, "[d]ue to her resisting [arrest] and in order for us to safely handcuff her, we had to bring her down, in a prone position, face first, onto the sidewalk. During this struggle she sustained scrapes to her face area." (DOJ p. 17).

Not able to determine incident.

16. "In the case of P.J., described above, a Narcotics Bureau officer stated that he made an effort "to extract[ ] [P.J.] through the passenger side door and prone[] [him] face down onto the pavement." According to another officer's narrative, this resulted in "minor abrasions to the right side of his face," and according to the booking sergeant in charge of filling out the SPD-276 form, P.J. had "small cuts to the face." These descriptions of P.J.'s injuries are plainly contradicted by the photographs in his prisoner injury file. These photographs clearly show severe contusions and dark bruising on the right side of his face, a large black eye, a gash on the bridge of his nose, and additional abrasions on the left side of his face and the left side of his nose. The injuries present in the photographs are inconsistent with the officers' reports, and are instead consistent with repeated strikes to P.J.'s head. Further, when interviewed by IIU after P.J. filed a complaint, a civilian witness stated that she saw officers kick P.J. in the head and body. During his IIU interview, P.J. stated that one officer struck him in the head with the butt of a handgun, and that once on the ground, several officers began kicking and punching him in the head and the body. P.J. further alleged that, once back at the station and in a holding room, a Narcotics Bureau officer walked in and beat him severely in the face with a book, causing him to bleed profusely. To be clear, there is no other corroboration of P.J.'s version of events besides the photographs we reviewed and the statement of the civilian witness. But these pieces of evidence are more consistent with some of P.J.'s reporting of the takedown than the officers' reports. Although IIU investigated P.J.'s complaint, IIU failed to sustain P.J.'s allegations and the officers received no discipline".(DOJ p. 18)

See Exhibit 9 in Appendix.

17. "In another prisoner injury file, Narcotics Bureau officers report that M.K., a 5'3" man, had a "small cut over and under his left eye," whereas the photographs show not only the small cuts but that his eye was almost swollen shut." (DOJ p. 18).

See Exhibit 14 in Appendix.

18. "In a 2016 incident, security camera footage directly contradicted aspects of the reports of Narcotics Bureau officers. In reports documenting a Narcotics Bureau arrest of S.L., a Narcotics Bureau officer stated that as he reached out to secure S.L., S.L. "backed away and struck [him] in the face with a closed fist." The officer reported that he then struck S.L. in the face and upper body in an attempt to stop S.L.

ADA Fitzgerald
July 2, 2021
Page 10

from striking him again. As reported by the officer, the circumstances of this
interaction would justify the force used. But the officer's account is belied by video
evidence, which shows S.L. standing, looking down at a piece of paper in his hand,
when two plainclothes officers rush towards S.L., grab his wrist and tackle him to
the ground. But for the video evidence of what happened in this use of force, the use
of force described in the misleading reports provided by the officers would have
appeared reasonable." (DOJ p. 18).

See Exhibit 8 in Appendix.

19. "In many cases, we were only able to identify untruthful reporting—and deficiencies in
the way force was actually used—because photographic and/or video evidence
happened to be available. However, these inaccurate reports indicate that it is not
uncommon for Narcotics Bureau officers to write false or incomplete narratives that
justify their uses of force. Because many prisoner injury files lack photographs of
subjects' injuries (in contravention of SPD policy) or video evidence of the arrest, the
inaccurate narratives raise substantial concern that there are other uses of unreasonable
force that are falsely reported." (DOJ p.18).

Not able to determine incident(s).

20. In one of them, the complainant alleged that a Narcotics Bureau officer reached in the
car while she was driving, pushed her against the seat, and grabbed her hand and
slammed it into the dashboard so hard that she was bruised. In her IIU complaint, she
submitted photos showing bruises. Because she was not arrested, no arrest report or
Prisoner Injury file exists for this incident. (DOJ p. 20).

Not able to determine incident.

21. "In another incident, the complainant alleged that a Narcotics Bureau officer pulled
him out of a car and handcuffed him roughly, only to release him because they had
attempted to arrest the wrong person. Following IIU investigations, neither of these
complaints were sustained". (DOJ p. 20).

See Exhibit 15 in appendix.

22. "For example, a prisoner complained that the "police beat me up," sprayed OC, and
struck him three times on the back of the head with a flashlight. The prisoner injury
report narrative states that the prisoner had a laceration on the left side of his head
and was transported to the emergency room of a local hospital for treatment.
SPD's Commissioner classified this excessive force complaint as a complaint that
needed to be reviewed only by the officer's chain of command. The investigative
file consisted of the officers' statements and the arrest report; there was no
statement from the complainant or witnesses. The supervisor's discipline was to
recommend retraining to "clearly articulat[e] use of force in reporting to accurately
depict necessity." The *prima facie* evidence in the reports indicated that that the
officer's force was potentially excessive; in response to the subject's resisting
arrest, the office struck the subject with a flashlight three times in the head–force

ADA Fitzgerald
July 2, 2021
Page 11

that could potentially cause death or serious bodily injury. Had SPD referred this case to IIU for a full investigation, the Department could have reasonably sustained an excessive force complaint, rather than finding only that the officer erred by improperly failing to justify his use of force." (DOJ p. 23).

See Exhibit 16 in appendix.

23. "In one IIU investigation regarding allegations of excessive force conducted in the spring of 2016, IIU failed to interview several key witnesses who observed the incident. The incident so disturbed the witnesses that they recounted it in social media postings the same day. The IIU investigator knew who the witnesses were, where they lived, and had taken a statement from another witness confirming their identities, yet never interviewed them, noting instead in the report that "all efforts to contact [them] were unsuccessful," without any detail as to what "efforts" he made. Other IIU files document similar failings in following up with key witnesses, including law enforcement officers from other agencies, to conduct interviews and obtain essential information." (DOJ p. 24).

See Exhibit 1 in appendix.

Once you have had a chance to review the appendix of records submitted with this letter, containing information collected in an effort to identify the incidents in the DOJ report and outlined above, please contact me to discuss next steps in this process of compliance with your request.

Very truly yours,

Edward M. Pikula

Enc. Appendix.

cc: Police Commissioner

## EXHIBITS

1. Arrest #: 16-646-AR; 16-647-AR; 16-648-AR; Arrest Date: 02/27/2016
2. SO# 15-083; 04/08/2015
3. Hampden County Superior Court Criminal Action No. 1579CR01041
4. Arrest #: 15-57-AR; Arrest Date: 01/06/2015
5. Arrest #: 19-2408-AR; #19-2409-AR; Arrest Date: 07/28/2019
6. Arrest #: 13-2691-AR; Arrest Date: 08/08/2013
7. Arrest #: 15-3059-AR; Arrest Date: 09/03/2015
8. Arrest #: 16-1983-AR; Arrest Date: 06/09/2016
9. Arrest #: 13-850-AR; Arrest Date: 03/22/2013
10. Arrest #: 15-3465-AR; Arrest Date: 10/01/2015
11. Arrest #: 18-2458-AR; Arrest Date: 07/25/2018
12. Arrest #: 17-305-AR; Arrest Date: 01/26/2017
13. Arrest #: 18-392-AR; Arrest Date: 02/09/2018
14. Arrest#: 14-590-AR; Arrest Date: 03/05/2014
15. IIU Report#: 02/08/2018; SO#18-051
16. Arrest#: 14-1230-AR; Arrest Date: 04/26/2014

# Attachment 2

**Edward M. Pikula**
*City Solicitor*
Law Department
36 Court Street, Room 210
Springfield, MA 01103
Office: (413) 787-6085
Direct Dial: (413) 787-6098
Fax: (413) 787-6173
Email: epikula@springfieldcityhall.com




**THE CITY OF SPRINGFIELD, MASSACHUSETTS**

August 24, 2021                              <u>**VIA EMAIL ONLY**</u>

Jennifer Fitzgerald                          jennifer.fitzgerald@state.ma.us
Assistant District Attorney
Hampden District
50 Court Street
Springfield, MA 01102

**RE:**    <u>*Response to Letter to Atty. William Fennell.*</u>

Dear Attorney Fitzgerald,

I am writing in follow up to your letter to Atty. William Fennell who provides outside legal
services to the Commissioner and her Command Staff. As per our discussion by phone
yesterday, I write to clarify the City's legal position with regard to the report prepared by Deputy
Chief Steven Kent referenced in your letter.

As referenced in my letter to District Attorney Gulluni dated December 10, 2020, Deputy Kent's work
product that you reference is related to a meeting that took place shortly after the issuance of the
Department of Justice Report in July 2020. At that time, I met with the Police Commissioner and
members of her staff to review the DOJ report for purposes of the potential litigation presented by the
results of the DOJ investigation pursuant to the Violent Crime Control and Law Enforcement Act of
1994, 34 U.S.C. § 12601. Given the DOJ conclusion that reasonable cause existed to believe that
Narcotics Bureau officers engage in a pattern or practice of excessive force in violation of the Fourth
Amendment of the United States Constitution, we needed to be prepared to meet any litigation that
may be forthcoming.

During that meeting I requested that the Police Commissioner assign personnel to review the
incidents described in the Report in an effort to identify the specific dates of incidents, police
officers that could be identified, as well as individuals who are referenced in the Report. As
noted in my response to your office dated July 2, 2021, that task was carried out and a report
was provided to my office by Deputy Chief Steven Kent.

My past experience with DOJ's Civil Rights Division includes a lawsuit brought under the
Voting Rights Act in which DOJ filed suit against the City and sought an injunction prior to
the City being able to negotiate a settlement agreement. As such, it was my opinion at the time
of my meeting in July 2020 that the City faced the prospect of litigating the details of each of
the incidents described. To date, we have been successful in avoiding litigation and we
continue to negotiate.

1

Under the circumstances, it is my opinion that the report by Deputy Kent is protected by the work-product doctrine as described in Mass. R. Civ. P. 26(b)(3) as "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation" as it is opinion work-product that was prepared in anticipation of litigation or for trial by or for a party or party representative. As such, Deputy Kent's report is protected from discovery to the extent provided under Mass. R. Civ. P. 26(b)(3), even where the opinion work product has been made or received by a State or local government employee. *See DaRosa v. City of New Bedford*, 471 Mass. 446, 462 (2015)(protecting opinion work product that would be protected from discovery by rule 26(b)(3) through exemption (d) of a public records request pursuant to G.L. c. 4, § 7, Twenty-sixth (*d* )).

The City and DOJ have been actively participating in settlement negotiations since the issuance of the report and it is my hope and expectation that the ongoing negotiations will result in a settlement agreement between the parties in the near future. I do not wish to jeopardize those discussions or compromise our bargaining position by release of the report. As such, I have provided you with the underlying factual information that the report is based on in the appendix to my letter of July 2, 2021, but not the report itself which provides analysis, impressions, or opinions.

As referenced in my past letters, I believe next steps towards addressing *Brady* obligations should be a meeting between the Springfield Police Department and the District Attorneys' office to review each incident, as well as an effort to coordinate with DOJ to confirm the accuracy of our efforts to identify the incidents described, and to obtain additional information where, either no determination could be made, or the determination is not accurate.

In furtherance of this, I would ask Commissioner Clapprood to arrange for Deputy Kent to participate in those discussions in order to provide information as to his methodology of searching for records provided and efforts to attempt to match them up to the incidents described in the report. As indicated, the records are by no means exhaustive, but simply used as a reference to attempt to identify the cases, officers, and individuals involved as described in the DOJ Report. Additional records that can be obtained after matching them to criminal case files and records in the District Attorneys' office to supplement as necessary and to the extent records are available.

As for including the report of Deputy Kent in your response to the SJC, I would make the report available for *in camera* inspection if so ordered, but I believe it should be protected from production to your office or any other party to avoid any potential claim of voluntary waiver and to maintain the ongoing negotiations with the DOJ.

In addition, as per our discussion, the appendix includes records and information that is exempt from public disclosure. Prior to any production of the appendix, redaction or other safeguards must be undertaken to protect the confidentiality of those records as applicable.

I hope this provides clarification as to the situation. I look forward to arranging a meeting between representatives of your office and the Police Department to discuss and identify the most efficient means of reviewing and producing any other document required in order to assure compliance with *Brady* obligations.  In the mean-time please feel free to contact me at 413-787-6085 to discuss in more detail.

2

Very truly yours,

Edward M. Pikula, City Solicitor.

EMP