UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ANTHONY D. GULLUNI, | ) | |
| District Attorney for the Hampden | ) | |
| County in the Commonwealth of | ) | |
| Massachusetts, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:21-cv-30058-MGM |
| | ) | |
| NATHANIEL R. MENDELL, | ) | |
| Acting United States Attorney for | ) | |
| the District of Massachusetts, | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**AND IN OPPOSITION TO DEFENDANT'S**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

The government's brief demonstrates not only a lack of understanding of the HCDAO's *Brady* obligation under Massachusetts state law, but an alarming indifference to the rights of state court defendants—who are presumably among those most affected by the practices criticized so roundly in the DOJ's report. This court should review the government's *Tuohy* denial *de novo*, as it involves an important constitutional question affecting these defendants' rights. See Section I, *infra*. However, even if the court applies the "arbitrary and capricious" standard to review that denial, the government's position is without merit: it was based solely on a claim of two privileges, work product and investigative. As argued in the District Attorney's original brief, the claim of work product privilege is and has always been meritless because the request sought only documents prepared in the ordinary course of business by the Springfield

Police Department (SPD) – not a federal agency.   The claim of investigative privilege, always ill-founded, has become moot as a result of recent events, thus leaving no basis for the government's claims. See Section III, infra.

More importantly, despite its stated goal to "ensure the fair and impartial administration of justice for all Americans,"[1] the government attempts to avoid addressing the merits of the glaring injustice perpetuated by its refusal to disclose exculpatory evidence it has learned by erecting a series of procedural straw men, none of which justify its actions.   The unvarnished truth is that the government is going to extraordinary lengths to avoid a result which is both just and efficient.   The government has within its power the ability simply to identify the exculpatory evidence it uncovered during its prolonged investigation of the SPD, thereby: 1) furthering the interests of justice by insuring that state court defendants get prompt access to *Brady* material; 2) avoiding repetitive litigation directed at both the DOJ and the HCDAO by defendants seeking access to that material; 3) avoiding duplication of efforts and expense by the HCDAO, a parallel law enforcement entity, and 4) extending and enhancing the beneficial effect of the extensive and expensive investigation that it conducted into the SPD.   The citizens whose rights are placed at highest risk by the government's decision are the very same people who were already the victims of the illegal practices the DOJ claims to have uncovered.

## **ARGUMENT**

I.     STANDARD OF REVIEW

Apparently conceding that 5 USC 706(2)(b) would require this court to conduct a *de novo* review of the DOJ's refusal to produce even a single document in response to the HCDAP's

---

[1] *See* Statement, U.S. DEP'T OF JUST., https://www.justice.gov/about

*Tuohy* request, the government argues that such a review is not required because it is not the District Attorney's constitutional rights at stake, but those of Hampden County defendants potentially affected by the exculpatory evidence that the government is withholding. See United States (hereinafter "U.S.") Memo at 7, 14.  This argument is contradicted by the plain language of 5 USC 706(2)(B), which requires the court to decide if the denial is "contrary to constitutional right, power, privilege, or immunity."  There is nothing in the statute that requires that the "constitutional right, power, privilege, or immunity" belong to the plaintiff seeking review of a *Touhy* denial.  Indeed, such an interpretation would be illogical: presumably the heightened standard of review arises from the constitutional basis of the rights at stake, and not the identity of the holder of such rights.

Indeed, the only case cited by the government in support of its argument in fact proves the HCDAO's point.  In *Boston Alliance of Gay, Lesbian, Bisexual and Transgender Youth v. U.S. Dep't of Health & Human Svcs., 2021 WL 3667760* (U.S. D.C. Mass. 2021), plaintiffs comprised of three private healthcare facilities that served LGBTQ patients, one membership organization, four advocacy organizations servicing the LGBTQ community, and others. These organizations contended that a new rule promulgated by HHS prohibited categorical coverage exclusions for transgender-related care. Thus, in *Boston Alliance*, as here, the plaintiffs were advocating for the constitutional rights ***of others***.  In permitting a de novo review of evidence beyond the administrative record, Judge Saris recognized the plaintiffs' claim that the deprivation of constitutional rights was motivated by "illicit animus," noting that courts are near uniform in allowing for external evidence under such circumstances. Id. at *18.

While the *Boston Alliance* case did not analyze situations such as the case at bar where there is no allegation of illicit animus, neither does it support the position for which the

government cites it (see U.S. Memo at page 6); instead, the decision implicitly assumes that, in appropriate circumstances, plaintiffs with representational standing are entitled to a broader review.  Id.  See also *People for Ethical Treatment of Prop. Owners v. United States Fish & Wildlife Serv.*, 852 F.3d 990 (10th Cir. 2017) (advocacy group brought action challenging constitutionality of government's authority to regulate "takes" of Utah prairie dogs on nonfederal land).

Similarly, the government's contention that cases decided under the Freedom of Information Act (FOIA) have no application to this case has been rejected by the First Circuit. The government's only stated reasons for denying the *Touhy* request were the investigative and work product privileges.  Since it is well-established that 5 U.S.C. and the *Touhy* regulations do not create any substantive privilege against disclosure, it is appropriate to look to the substantive law of privilege, including cases decided under FOIA, to determine whether the government's claims are valid.  See *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 63 (1st Cir. 2007) (FOIA provisions "provide guidance in determining the appropriate scope of the [investigative] privilege").  Thus, this court must decide whether either claim of privilege is valid; if there is no valid privilege, the government's *Tuohy* denial must be reversed under any standard of review.  See *Agility Pub. Warehousing Co. K.S.C.P. v. U.S. Dep't of Def.*, 246 F. Supp. 3d 34, 47–48 (D.D.C. 2017)  (denial based on legally incorrect assertion of privilege is "an arbitrary and capricious decision"); *Cavanaugh v. Wainstein,* No. CIV.A.05-123(GK), 2007 WL 1601723, at *9 (D.D.C. June 4, 2007) (DOJ's work product determination in *Touhy* case was arbitrary and capricious); see also *Puerto Rico v. United States*, 490 F.3d at 70-71 (assertion of valid investigative privilege "neither arbitrary nor capricious").

While the government suggests that this court should treat its claim of privilege with deference, see U.S. Memo at 16, the essence of the review is whether the privilege is valid. The government cites no case for the proposition that this court may defer to the government's assertion of an invalid privilege. Similarly, the blanket refusal to produce *any* documents in response to the *Tuohy* request suggests an arbitrary and capricious action. Compare *Puerto Rico v. United States*, 490 F.3d at 66 (decision less likely to be arbitrary and capricious where "United States has been reasonably forthcoming" in releasing information). There is nothing either reasonable or forthcoming about the government's blanket denial.


II.     THE GOVERNMENT MISUNDERSTANDS AND MISSTATES THE HAMPDEN
        COUNTY DISTRICT ATTORNEY'S *BRADY* OBLIGATION UNDER
        MASSACHUSETTS LAW.

In contradictory fashion, the government seems to argue first, that the HCDAO has no *Brady* obligation because the HCDAO is *not* "in possession" of exculpatory evidence (U.S. Memo at 8, Section C.1), but then takes the contrary position, that the HCDAO *is* already "in possession" of exculpatory evidence (U.S. memo at 17). As to the latter argument, the government blithely ignores the undisputed fact that it alone knows which of the 114,000 documents to which the Springfield Police Department granted it access were actually reviewed and formed the basis of the DOJ report. Instead, it seems to suggest that, rather than have the DOJ disclose the documents upon which it relied, the HCDAO should repeat, at onerous and wasteful state taxpayer expense, the 27-month DOJ investigation for which federal taxpayers have already paid. (U.S. Memo at page 12, fn.13) This argument is ludicrous, both because it would require a massive and duplication of resources, and because it would delay by years the

vindication of the constitutional entitlement of state court defendants to receive the DOJ-asserted exculpatory evidence.

At the same time, the government seems to suggest that the HCDAO has no disclosure obligation because it is not in possession of the SPD documents.  This argument overlooks the settled law that documents in possession of the prosecution team—a term including the SPD— are subject to disclosure by the HCDAO.  See *Commonwealth v. Murray*, 461 Mass. 10, 19 (2011).

Finally, the government completely misunderstands the impact of the Supreme Judicial Court's decision in *Matter of a Grand Jury Investigation*, 485 Mass. 641 (2020).  The government claims the SJC simply held that "a prosecutor does not need judicial authorization to disclose exculpatory evidence to defense counsel in other cases."  U.S Memo at page 9, fn. 9. This gross oversimplification of the holding that the *Brady* obligation merely applies to immunized testimony ignores the reality that the Court laid down a broad new directive[2] that requires state prosecutors to disclose information upon a determination that:

> a police officer lied to conceal the unlawful use of excessive force, whether by him- or herself or another officer, or lied about a defendant's conduct and thereby allowed a false or inflated criminal charge to be prosecuted… to defense counsel *in any criminal case where the officer is a potential witness or prepared a report in the criminal investigation*.

485 Mass. at 658 [emphasis added].  The documents requested by the HCDAO clearly fall within this directive; the government's claim that "determinations of untruthfulness were incidental" to

---

[2] The two cases cited by the government as support for its suggestion that this duty predated the Court's decision in *Matter of a Grand Jury Investigation* in fact provide no support whatsoever.  *Commonwealth v. Collins*, 470 Mass. 255 (2014) involved an allegation that the Commonwealth had failed to disclose a promise of leniency made to a key prosecution witness against the defendant.  *Commonwealth v. St. Germain*, 381 Mass. 256, 261, 408 N.E.2d 1358, 1363 (1980) concerned delayed disclosure of a prior taped recorded interview of a prosecution witness regarding the events in question.  In any event, regardless of when the duty to disclose in unrelated cases was established, it is undeniably a current obligation for Massachusetts prosecutors.

the primary task of investigating excessive use of force (U.S. Memo at page 2, fn. 3) does not shield them from disclosure under *Brady*.  Indeed, both the Supreme Judicial Court and the HCDAO's *Touhy* request are framed in identical language of a law enforcement agency's "determination."  Id. at 658; CAR at 13-14.


III.     THIS ACTION IS NOT MOOT AND IS RIPE FOR DECISION BY THIS COURT.

Despite the fact that the government has no idea which incidents the SPD has identified as *potentially* the subjects of the DOJ report,[3] it makes the astonishing claim that it can "confirm" that the SPD's identification of various incidents is correct. U.S. Memo at 13.; see U.S. Memo at 17 ("SPD has, in fact, identified all of the incidents as to which DOJ made a determination of untruthfulness").  The context is this:

The DOJ report identified 23 specific incidents (without actual case names) supporting its conclusions.  These "factual descriptions" raise the possibility that the related documents would constitute *Brady* material, not just as to the defendants involved in those incidents, but to all other cases where the officers involved in those incidents are potential witnesses or authored reports.  See *Matter of a Grand Jury Investigation*, 485 Mass at 658.  Because the DOJ has steadfastly refused to identify those or other incidents with Brady implications[4] in any way, the

---

[3] The "Pikula letter," in which the City described its efforts to identify incidents based on the limited information in the DOJ report, *did not set forth the actual identification of any specific case*. (The "guesses" were shown only in accompanying primary documents not a part of this record and never provided to the government).  Thus, it is unclear how the government could "confirm" that the City's identification of incidents is correct, when it does not know what the identification was. The Pikula letter also noted the City's inability to identify several incidents because the DOJ report was too vague.  See Pikula letter, Exhibit A to Affidavit of Jennifer N. Fitzgerald, Docket 21-1.

[4] *See e.g.*, DOJ report at page 16 ("officers made false reports that were inconsistent with other available evidence"; "Narcotics Bureau officers regularly underreport uses of force"), page 17 ("many [Narcotics Bureau arrest reports] refer to a use of force that is not documented anywhere else"), page 18 ("multiple incidents in which available evidence discredited the Narcotics Bureau officers' account of what occurred"), pages 18-19 ("not uncommon for Narcotics Bureau officers to write false or incomplete narratives that justify their uses of force"), page 21 ("on multiple occasions, outside evidence, including video footage, demonstrated that Narcotics Bureau officers' descriptions of events involving use of force situations was not credible"). [App. Exh. 2].

City of Springfield assigned an SPD officer to review internal records to *try* to identify some of the incidents as to which the DOJ had provided dates or other distinctive details.  The officer tentatively (but not definitively) identified 16 of the 20 to 23 such incidents, and provided related documents to the HCDAO.  At least four other specific incidents, along with countless incidents described more generally, remain a mystery.  Fitzgerald affidavit, Docket 21-1, ¶¶5-7.

Despite the fact that the incidents thus *tentatively* identified appear nowhere in this record, the government nevertheless purports to "confirm[]" that the "universe of relevant reports" has been correctly identified by the SPD.  U.S. Memo at 13.  This omniscience defies logic and reality; yet the government asserts that its confirmation renders this entire dispute moot.  Passing the paradox of how the government could "confirm" identifications that are not in the record, the identification of those incidents does not render this case moot.

There remain an unknown number of incidents that the SPD officer was unable even tentatively to identify because of lack of specific details in the DOJ report.  More importantly, the DOJ report contains sweeping allegations of misconduct that would clearly implicate *Brady* under existing Massachusetts law.  See fn. 1 *supra*; Fitzgerald affidavit, Docket 21-1, ¶7.  These incidents that form the basis for these serious allegations fit squarely within the HCDAO's *Tuohy* request, and there is no question of mootness.

There is one issue, however, which is apparently moot.  One of the two claims of privilege asserted by the government as the basis for its denial of the *Tuohy* request was the investigative privilege.  See U.S. Memo at p. 13, fn.14; 19-20.  It appears that the government has entered into a consent decree with the City of Springfield.  See Assistant Attorney General Kristen Clarke Announces Consent Decree with City of Springfield, Massachusetts | OPA |

Department of Justice.  In light of this recent development, the government's arguments supporting such a privilege (see U.S. Memo at 16-17)—always feeble—have now vanished.

The issue is ripe for this court's decision.  The HCDAO has been sued by various defendants, defense lawyers and organizations seeking to compel an investigation similar to that conduct by the DOJ.  Fitzgerald affidavit, Docket 21-1, ¶11. Further, the HCDAO faces repeated litigation in individual criminal cases seeking access to the documents that are the subject of its *Touhy* request.  The harm flowing from this wide-ranging litigation is all-too-present and burdensome—to the courts, to the taxpayers, and potentially to defendants.

Respectfully submitted,

ANTHONY D. GULLUNI,
District Attorney for the Hampden
County in the Commonwealth of
Massachusetts,

By his attorneys,

By:    */s/Elizabeth N. Mulvey, Esquire*
Elizabeth N. Mulvey
Crowe and Mulvey, LLP
77 Franklin Street, Third Floor
Boston, MA 02110
(617) 426-4488
emulvey@croweandmulvey.com

/s/ *Thomas M. Hoopes, Esquire*
Thomas M. Hoopes
Libby Hoopes Brooks, P.C.
399 Boylston Street
Boston, MA 02116
(617) 338-9300
thoopes@lhblaw.com

Dated: May 2, 2022

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: May 2, 2022

                */s/Elizabeth N. Mulvey, Esquire*